05 SEP -9 AM II: II

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W.D. OF TN, JACKSON

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

JOSEPH KYLE,                              )
                                          )
     Plaintiff,                          )
                                          )
VS.                                       )     No. 04-1180-T/An
                                          )
BENTON COUNTY, TENNESSEE;                 )
ET AL.,                                   )
                                          )
     Defendants.                         )

---

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND
## ORDER DISMISSING STATE LAW CLAIMS

---

     Plaintiff Joseph Kyle filed this civil rights action pursuant to 42 U.S.C. § 1983. The

defendants are Benton County, Tennessee, Benton County Mayor Jimmy Thornton, Benton

County Sheriff Cecil Wells, Sheriff's Deputies Tim Vitt, Ricky Pafford and Jason Lowery,

and Benton County Commissioners Tommy Spence and Dale Cunningham. Kyle alleges

that his rights under the First and Fourth Amendments have been violated, and he also

asserts state law claims of malicious prosecution, assault and negligence. The defendants

have filed a motion for summary judgment, and plaintiff has filed a response.

     Motions for summary judgment are governed by Fed. R. Civ. P. 56. If no genuine

issue of material fact exists and the moving party is entitled to judgment as a matter of law,

This document entered on the docket sheet in compliance
with Rule 58 and/or 79 (a) FRCP on _9/12/05_



summary judgment is appropriate. Fed. R. Civ. P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 323.

"If the defendant . . . moves for summary judgment . . . based on the lack of proof of a material fact, . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). However, the court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. Id. at 249. Rather, "[t]he inquiry on a summary judgment motion . . . is . . . 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 251-52). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970).

Facts

The evidence in the record shows that Kyle regularly attended meetings of the Benton County Commission ("Commission"), which were chaired by Mayor Jimmy Thornton. Kyle also sometimes attended meetings of the Commission's various committees. He often sought and was recognized to speak during the public comment portion of the Commission meetings. Kyle's comments were often critical of the actions, or inactions, of those in the County government. The parties agree that there was an accepted, albeit unwritten, rule that each person desiring to speak during the public comment portion of a meeting was limited to five minutes. There are five specific incidents in which Kyle alleges his civil rights were violated.

On February 16, 2004, Kyle attended the regular Commission meeting[1] and was recognized to speak during the public comment period. He read from a prepared statement on the topic of licensing home improvement contractors, but at the end of his statement Kyle stated that he took exception to the sign on the door and the "show of excessive force," referring to the presence of the Sheriff and four deputies. The sign on the door was a copy of Tenn. Code Ann. § 39-17-306, which provides:

> (a) A person commits an offense if, with the intent to prevent or disrupt a lawful meeting, procession, or gathering, the person substantially obstructs or interferes with the meeting, procession, or gathering by physical action or verbal utterance.

---

[1] In support of his response to the defendants' Motion for Summary Judgment, plaintiff has submitted videotapes of the February 16, 2004 and the May 17, 2004 Commission meetings. The Court has reviewed those videotapes.

3

(b) A violation of this section is a Class B misdemeanor.

After finishing his remarks, Kyle said, "thank you." There was applause, and an unidentified individual made a comment. Thornton briefly addressed the licensing issue Kyle had spoken about, and then stated, "And, umm, I did feel threatened by you Mr. Kyle. I felt threatened enough to dial 911. It'll be this way. That's the way it will be. The floor is open to the public." There is no explanation in the record regarding the incident to which Thornton was referring.

Kyle then spoke again, in response to Thornton's comment, without being recognized anew. He was loud, but he did not actually shout. Kyle said, "Wait a minute, you directed a statement directly towards me, what did I do to make you feel threatened . . ." Thornton was trying to recognize another person to speak while Kyle was talking. Thornton ruled Kyle out of order and instructed him to sit down. Kyle then got even louder and began to argue, "I'm not out of order, you're out of order sir." Thornton ordered him removed from the meeting. Two deputies escorted Kyle out of the room, during which he loudly proclaimed that his civil and constitutional rights were being violated. Kyle was not arrested on that occasion.

Kyle attended a meeting of the Commission's Budget Committee on March 9, 2004.[2] Thornton also attended the meeting, but apparently did not arrive until it had already

---

[2] Notwithstanding the allegations in his complaint, plaintiff now states, in his response to the motion for summary judgment, that he is not asserting that this incident "is a separate cause of action but was a recitation of facts to give an overall view of the attitude by the authorities in Benton County, Tennessee towards Plaintiff." (Pl.'s Mem. in Opp., at 9.)

adjourned.  At the request of the committee chairperson, Thornton requested that a deputy sheriff attend the meeting.  The chairperson, Commissioner Murleane Steinbuck, had indicated to Thornton that she was afraid something would happen to her.  What Ms. Steinbuck specifically feared, however, is not explained.  The evidence is unclear as to whether the deputy arrived late with Thornton, or whether he was already there when Thornton arrived.  In addition, the evidence is disputed as to whether that was the first time a deputy had ever attended a meeting of the Budget Committee.  Kyle contends that the deputy was there only to intimidate him and to prevent him from speaking.  However, the rules of the Budget Committee require all who want to speak to sign up in advance so they will be placed on the agenda.  Kyle had not sought to be placed on the agenda for that meeting.

On April 27 or 28, 2004, Kyle received a telephone call at his home from defendant Tommy Spence, a Benton County Commissioner.  Kyle's "Caller ID" indicated that Spence was calling from his own home, not from any County office.  Kyle believed that Spence was intoxicated, as he was slurring his words.  Spence shouted at Kyle and swore at him, calling him and his family members obscene names.  Spence told Kyle that he needed to stay out of the Commission meetings because he was sick of listening to him.  While Spence did not specifically threaten physical violence, Kyle felt threatened by his belligerent, obscene language.  After the telephone call, Kyle called the police and reported the incident, telling the responding officer that he wanted to file a formal complaint.

Kyle attended a meeting of the Commission's Law Enforcement Committee on May 10, 2004. The Law Enforcement Committee did not have a rule requiring all speakers to be on the agenda. It was Kyle's intent to address the Committee at that May 10 meeting. Benton County Commissioner Robert Pace, who was present at the time, has given a sworn statement supporting Kyle's description of what happened. Mayor Thornton was also present at the meeting, but describes a different version of the events.

At the end of the meeting, defendant Dale Cunningham, a Benton County Commissioner and the Law Enforcement Committee Chairman, asked if anyone wanted to speak. After Commissioner Pace had taken the opportunity to speak, Cunningham again asked if anyone had anything to say. When no one stepped up, Cunningham adjourned the meeting. Kyle, who has difficulty with his hearing, apparently did not hear Cunningham adjourn the meeting. When it became apparent that the meeting was breaking up, Kyle asked if he could address the Committee but was told by Cunningham that it was too late, the meeting had been adjourned. Up to this point, the events are undisputed.

According to Kyle, after he realized the meeting was over, he began speaking to Allen Webb, a member of the Committee. Cunningham, however, testified that Kyle began verbally attacking Webb, acting in a threatening manner and screaming at him regarding what Kyle believed to be Webb's illegal appointment as coroner. When Cunningham started to leave the room, Kyle was either between Cunningham and the door or actually standing in the doorway. Kyle testified that Cunningham approached him, placed both hands on his

6

chest and shoved, knocking him to the floor and causing injuries for which he sought medical treatment. In Pace's statement he describes the actual shove in a similar manner, but does not state that Kyle was knocked down, merely that Cunningham pushed him, "displacing Mr. Kyle about 18 inches to 24 inches by my estimate." (Kyle Dep., Ex. 3.)

Cunningham and Thornton describe the incident much differently. Thornton testified that when Cunningham tried to exit the room, Kyle blocked the door by putting his arm out against the wall. Cunningham told Kyle not to do that, then ducked under Kyle's arm and left. Cunningham testified that although Kyle blocked the door, he brushed by him, touching him slightly, and exited the room. Both Thornton and Cunningham testified that Kyle then threw up his arms, saying "Whoo!" and that Mrs. Kyle began yelling "Assault! Assault!" (Thornton Dep. at 22-23; Cunningham Dep. at 16.) Cunningham proceeded to leave the building.

The last incident of which Kyle complains occurred at the County Commission meeting on May 17, 2004. Prior to that meeting, Sheriff Cecil Wells told both Deputy Vitt and Sergeant Bryant Allen that he had had enough of Kyle, and that if Kyle "got out of hand" in the meeting, he was to be arrested and charged with violating the Tennessee Code section that posted on the door, § 39-17-306. The Sheriff further told Vitt and Allen that "getting out of hand" meant being unruly and not following the instructions of either Mayor Thornton or an officer. (Wells Dep. at 41-44.) Allen informed Deputies Pafford and Lowery of the Sheriff's instructions. Lowery testified that Allen also said "if he gave any

7

resistance, he was to be slammed on the floor and pepper sprayed." Allen told Lowery, "That came from the Sheriff." (Lowery Dep. at 6-7.) However, the Sheriff denies telling anyone to pepper-spray Kyle if he resisted. Deputies Vitt and Pafford worked security at the May meeting, and were present until they later escorted Kyle out. Deputy Lowery was there for a portion of the meeting, but was called away before the incident with Kyle occurred.

At the end of the meeting, Thornton opened the floor for public comment. At that time, several of the commissioners asked to be excused and left the room. After a few other people spoke, Kyle was recognized and given the floor. Kyle faced the audience and began voicing his dissatisfaction with those commissioners who left the meeting prior to the public comment period. Thornton interrupted to ask him to address the Commission, not the audience, so Kyle turned around and faced the Commission. He began talking about the abusive telephone call he received from Spence and the alleged assault by Cunningham. He was speaking loud enough for all in the room to hear, but he was not shouting.

At that point Thornton interrupted again, telling Kyle to stick to the subject. The "subject" to which Thornton referred is unclear, as the public speakers that night had addressed more than one topic. In any event, Kyle continued speaking. Thornton then told Kyle to sit down, that he was not going to attack someone who was not present, but Kyle continued to talk over him. While his language was not profane or abusive, he became progressively louder and continued arguing and refusing to sit down when he was ruled out of order. Thornton then called out to the deputies, "Come and get 'im, come and get 'im."

8

Kyle was removed from the room by Deputies Vitt and Pafford; he did not resist and no force was used. Once outside the room, Vitt advised Kyle that he was under arrest for disrupting the meeting. Deputy Lowery returned to transport Kyle to jail. Kyle made bond later that night and was released. The charge was later dismissed on motion of the District Attorney.

First Amendment Claims

It is without doubt that Kyle's speech in this case was expression protected by the First Amendment. However, the First Amendment's guarantee of free speech is not absolute; it does not give an individual the right to express his views at any time, in any place and in any manner he desires. See Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981). The Supreme Court employs a "forum analysis" to determine to what extent the government may constitutionally limit expressive activity on its property. See Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 800 (1985); Tucker v. City of Fairfield, Ohio, 398 F.3d 457, 463 (6th Cir. 2005).

There are three forums that are generally recognized in First Amendment jurisprudence: the traditional public forum, the designated public forum, and the nonpublic forum. See Cornelius, 473 U.S. at 800; United Food & Commercial Workers Local 1099 v. City of Sidney, 364 F.3d 738, 746 (6th Cir. 2004). The Benton County Commission meetings in this case constitute a designated public forum, *i.e.*, public property that is not a traditional public forum such as a street or park, but that has been designated a public forum

for a certain period of time.  See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460

U.S. 37, 45 (1983).  Although the government is "not required to indefinitely retain the open

character of the facility, as long as it does so it is bound by the same standards as apply in

a traditional public forum."  Id. at 46.  Thus, in both traditional and designated public

forums, the government may enforce reasonable time, place and manner regulations that are

content-neutral, narrowly tailored to serve a significant governmental interest and leave open

ample alternative channels of communication.  See Bd. of Airport Comm'rs v. Jews for

Jesus, Inc., 482 U.S. 569, 572-73 (1987).

The defendants argue that Kyle was removed from the February 2004 and the May

2004 Commission meetings in accordance with Tenn. Code Ann. § 39-17-306, which they

contend is a constitutionally permissible reasonable time, place and manner restriction.  The

Tennessee Court of Criminal Appeals had the opportunity to consider this issue in State v.

Ervin, 40 S.W.3d 508 (Tenn. Crim. App. 2000).   Addressing a challenge to the

constitutionality of the statute both on its face and as applied in that case, the Court held that

the statute was constitutionally valid:

> [The statute] makes no reference to any particular message. Its purpose
> is to protect the rights of citizens to lawfully assemble for their common good.
> The language of the present statute makes no reference at all to the purpose
> of the assembly or to the content of the "verbal utterance" of the person
> violating the statute.  It is content-neutral in that it does not criminalize any
> particular type of speech, rather it prohibits only speech or actions which
> disrupt lawful meetings or processions.  The nature of the interference is
> gauged only by reference to the manner in which the speaker delivers his or
> her message, and not to the substantive content of the speech itself.
> The defendant, while conceding that the statute is content-neutral as

written, asserts that it was applied in a content-discriminatory manner as to him. The defendant suggests that had he been loudly supporting the police instead of condemning them, he would not have been arrested. This is pure speculation on his part and does not bring into question the content-neutral nature of the statute as written. We conclude that both the language itself and the justification for the statute have nothing to do with content, and, therefore, the statute satisfies the requirement that time, place, or manner regulations be content-neutral.

. . . Specifically, it prohibits an individual from substantially obstructing or interfering with a lawful "meeting, procession, or gathering" with the intent of preventing or disrupting it. Here the interest of the government is substantial, even compelling, in that it is aimed at balancing the fundamental right of assembly with that of free speech.

. . . We conclude that the state's significant interest in protecting the fundamental right of assembly is served in a direct and effective way by the prohibition against the intentional and substantial obstruction of a lawful meeting.

. . . [The statute] leaves open ample alternative channels of communication because the statute prohibits only conduct that disrupts meetings, processions, or gatherings. The defendant and the other protesters were free to voice their opinions in a location that did not disrupt the service.

Id. at 517-18 (footnotes omitted). This Court agrees with the reasoning of the Court of Criminal Appeals that § 39-17-306 is content-neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels of communication, and thus is a valid time, place and manner restriction.

Kyle apparently argues, like the defendant in Ervin, that even if the statute is content-neutral on its face, it was applied to him in a content-discriminatory manner. He argues that the defendants' general hostility toward his views may be inferred from other events. Specifically, Kyle contends that some time in the last two years, Sheriff Wells had a report run on him by the Tennessee Bureau of Investigation ("TBI"). However, there is no

evidence that Thornton or any of the other commissioners was aware that Wells had

obtained such a report. There also is no evidence that Wells's motive for obtaining the TBI

report was to prevent Kyle from exercising his constitutional rights.[3]

With regard to the February 2004 meeting, Kyle contends that the only reason he was

removed before he had used his allotted five minutes was because Thornton did not want

to be challenged for saying that he felt threatened by Kyle. However, the videotape of the

February meeting shows that, notwithstanding his assertion that he probably would have

made further remarks, Kyle had finished his prepared statement, said "thank you" and

received some applause. It was reasonable for Thornton to assume that Kyle was through

speaking at that point. Even though Thornton responded to Kyle's comments, his

re-opening the floor for other speakers demonstrates that it was not his intent to have a

dialogue with Kyle. Nevertheless, instead of seeking to be recognized again, Kyle simply

started talking and then began to argue loudly when Thornton ruled that he was out of order.

There is no evidence suggesting that Thornton had Kyle removed because of what he said

rather than the disruptive manner in which he said it.

The Court finds, as a matter of law, that Kyle's First Amendment rights were not

violated by his removal from the February 2004 meeting.

Thornton's actions in the May 2004 meeting, however, are problematic. Thornton

---

[3] Wells admitted that he authorized the TBI report, stating that because of Kyle's behavior in the Commission meetings, some of the female commissioners were afraid of him. Since Wells knew nothing about Kyle, he decided to request the TBI report.

admits that the only reason he interrupted Kyle and stopped him from speaking was because he was not going to allow Kyle to verbally attack commissioners who were not there to defend themselves.   Regarding the rules about what topics could be addressed at Commission meetings, Thornton testified as follows:

> Q.    Okay. Do you have any rules on topics that can be discussed?
> A.    I personally don't want somebody to bash an elected official that's not there to defend theirselves.
> Q.    All right. Describe to me what *bash* means. What do you mean by *bash*?
> A.    Well, you know, when a man stands up and face the audience and tell them about one of the commissioners assaulting him . . . .
>        . . . .
> Q.    . . . My question was: Are there any rules about what subjects can be discussed at these open —
> A.    Not adopted by the commission.
> Q.    Okay. So is it safe to say that you make the decision on what topics can be talked about and what cannot?
> A.    No, anything can be talked about.
> Q.    Except bashing?
> A.    Except bashing on an elected official.
> Q.    Okay. Is that a rule anywhere?
> A.    That's just what we've always agreed on.
> Q.    All right. Who's we?
> A.    Myself and the county commission.
> Q.    Was it put in any form of writing?
> A.    I'd have to go back to my rules of order. I would be doubtful.
>        . . . .
> Q.    Okay. Have you — Okay. So your rule is that bashing is allowed as long as there's a commission member there to defend themselves?
> A.    Sure.
> Q.    But that's not a formal written rule?
> A.    Un-unh.
> Q.    And that has been your policy. How long has that been your policy?
> A.    Ever since I've been chairman.
>        . . . .
> Q.    Okay. Has it ever come up for a vote with the county commission, this

rule about bashing you're talking about?

A.     No. . . .

(Thornton Dep. at 38-43.)

In <u>Ward v. Rock Against Racism</u>, 491 U.S. 781 (1989), the Supreme Court explained:

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. <u>Community for Creative Non-Violence</u>, *supra*, 468 U.S. 295, 104 S. Ct., at 3070. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. <u>See</u> <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 47-48, 106 S. Ct. 925, 929-930, 89 L. Ed. 2d 29 (1986). Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech." <u>Community for Creative Non-Violence</u>, *supra*, 468 U.S., at 293, 104 S. Ct., at 3069 (emphasis added); <u>Heffron</u>, *supra*, 452 U.S., at 648, 101 S. Ct., at 2564 (quoting <u>Virginia Pharmacy Bd.</u>, *supra*, 425 U.S., at 771, 96 S. Ct., at 1830); <u>see</u> <u>Boos v. Barry</u>, 485 U.S. 312, 320-321, 108 S. Ct. 1157, 1163-1164, 99 L. Ed. 2d 333 (1988) (opinion of O'Connor, J.).

<u>Id.</u> at 791-92. This content-neutrality must extend not only to the specific content, but also to the subject matter of the speech. <u>Ater v. Armstrong</u>, 961 F.2d 1224, 1227 (6th Cir. 1992) (quoting <u>Heffron</u>, *supra*, 452 U.S. at 648). The Supreme Court has held that the "First Amendment's hostility to content-based regulation extends . . . to prohibition of public discussion of an entire topic." <u>Consolidated Edison Co. v. Pub. Serv. Comm'n</u>, 447 U.S. 530, 537 (1980).

Thornton's informal "rule" that absent commissioners may not be "bashed" is based entirely on the negative subject matter of the speech. Presumably, he would not object if a

member of the public desired to use his allotted time to say something favorable about an absent commissioner. The rule is not saved by the argument that it is necessary to maintain order in Commission meetings. Making negative comments about an absent commissioner does not, in and of itself, constitute disruption of a meeting. The manner in which negative comments are made may, perhaps, become disruptive, but the speech alone is not. This rule prohibiting negative comments about absent commissioners is not "justified without reference to the content of the regulated speech." Rock Against Racism, 491 U.S. at 791.

Moreover, Thornton's rule about "bashing" those not present is not codified in any form, and was never formally adopted by the Commission. This informality raises serious concerns, as there does not appear to be any check on Thornton's discretion to determine who gets "bashed" and who does not. Ater, 961 F.2d at 1227 ("The restriction, moreover, must not 'suffer from the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority.'") (citation omitted).

As stated, *supra*, the videotape of the May 2004 meeting shows that Kyle had not yet become disruptive when Thornton first interrupted and attempted to stop him from "bashing" Commissioners Spence and Cunningham. Thus, a jury could reasonably find that Thornton violated Kyle's First Amendment rights by prohibiting him from talking about those individuals.

Regarding Kyle's actual ejection from the May 2004 meeting, however, the Court finds that the material facts are not in dispute, and that he was properly ejected pursuant to

Tenn. Code Ann. § 39-17-306. Regardless of whether Thornton's initial effort to silence Kyle was a violation of his First Amendment rights, Kyle did not have the right to disrupt the meeting with loud arguing and a refusal to yield the floor. Although Kyle has suggested that there was a conspiracy[4] among the various defendants to violate his rights by having him arrested, there is no evidence that Thornton was aware that Sheriff Wells had instructed the deputies to arrest Kyle if he "got out of hand" or that Thornton instructed or encouraged Wells to be prepared to arrest Kyle. Even if there were such evidence it would be immaterial, since Kyle actually did become disruptive during the meeting.

Kyle also complains that the presence of a deputy sheriff at the Budget Committee meeting, the telephone call from defendant Spence, and the alleged assault by defendant Cunningham were all intended to intimidate him and prevent him from exercising his First Amendment rights. However, he has offered no actual evidence to support these assertions other than his own theories and speculations. While Spence may have drunkenly said that Kyle should stop coming to the Commission meetings, there is no evidence that he was speaking officially on behalf of Benton County or anyone else other than himself as an individual. The Court concludes that, as a matter of law, the deputy's appearance at the Budget Committee meeting, Spence's telephone call and Cunningham's alleged assault do

---

[4] Although the defendants' motion addresses a possible conspiracy claim under 42 U.S.C. § 1985(3), no such cause of action is asserted in the complaint. To the extent that Kyle does intend to assert a conspiracy claim he has failed to satisfy the requirements of § 1985(3). That statute requires a plaintiff to establish that there is a "racial or other class-based invidiously discriminatory animus" behind the alleged conspirators' action. Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971). There is no allegation, and no evidence, of that in this case.

16

not rise to the level of constitutional violations.

In summary, the individual defendants are entitled to judgment as a matter of law on Kyle's First Amendment claims, with the exception of the claim against Thornton in connection with his May 17, 2004 prohibition of Kyle's negative comments about commissioners who were not present.

Fourth Amendment Claims

Kyle has alleged that his arrest at the May 2004 Commission meeting violated his Fourth Amendment rights.[5] Specifically, he alleges that there was no probable cause for the arrest and that the arrest warrant was unsigned.

Under the Fourth Amendment, law enforcement officers must have probable cause to arrest an individual. Probable cause has been defined as those "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); Wolfe v. Perry, 412 F.3d 707, 716-17 (6th Cir. 2005).

Kyle argues that there was no probable cause for his arrest because the deputies who escorted him out and arrested him had a mistaken belief that it was a crime merely for him

---

[5] Kyle has asserted a malicious prosecution claim under Tennessee law. (Compl. ¶ 9.) He also alleges, "All of the action stated herein constitute violations of Section 1983 . . . in that they have deprived Plaintiff of his . . . right to due process under the Fourth Amendment." (Compl. ¶ 10.) This may or may not be a drafting error. The Due Process Clause applicable to state action is contained in the Fourteenth Amendment, not the Fourth. However, in Albright v. Oliver, 510 U.S. 266 (1994), the Supreme Court declined to recognize a substantive due process right under the Fourteenth Amendment to be free from "malicious prosecution." Any such claim alleging a lack of probable cause for arrest must be analyzed under the Fourth Amendment.

17

not to follow Thornton's instructions.[6]  However, the law is clear that the deputies' subjective reasons for making the arrest are irrelevant to the question of whether probable cause existed, as long as the facts and circumstances, viewed objectively, justify the arrest. Devenpeck v. Alford, 125 S. Ct. 588, 593-94 (2004).  Thus, it is also irrelevant that Sheriff Wells instructed the deputies prior to the meeting that they were to arrest Kyle if he became disruptive.  The Court finds as a matter of law that, viewed objectively, the deputies had probable cause to arrest Kyle for disrupting the May 17, 2004 meeting when he began to argue and refused to yield the floor after being instructed to sit down.

The fact that the formal arrest warrant, issued the day after Kyle's arrest , was only belatedly signed does not constitute a Fourth Amendment violation.  The arrest in this case clearly was a warrantless arrest made after a misdemeanor offense was committed in the presence of the deputies.

For these reasons, all of the individual defendants are entitled to judgment as a matter of law on Kyle's Fourth Amendment claims.

<u>Benton County Liability</u>

Liability under § 1983 may not be based solely upon a theory of *respondeat superior*. Monell v. Department of Soc. Serv., 436 U.S. 658, 691, 694 (1978).  A local governmental

---

[6] In his response to the motion for summary judgment, Kyle states that Deputy Lowery was in the room until Thornton called Kyle out of order, and testified that he did not see any violation of the law.  However, Lowery testified that he did <u>not</u> see the incident with Kyle that occurred during the public comment portion of the meeting. Rather, Lowery testified that during the portion of the meeting when the Commission was discussing business, Kyle made an outburst, and Thornton told him to be quiet.  That was the last thing Lowery remembered seeing between Kyle and Thornton before he was called away to the jail, and up to that point he had observed no violation of the law.  (Lowery Dep. at 8-10.)

entity,[7] such as a city or a county, "is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the [governmental entity] itself is the wrongdoer." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 122 (1992). The constitutional violation must stem from the enforcement of a governmental policy or custom. Monell, 436 U.S. at 691, 694.

There must be a showing that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

> [A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. . . . A showing of simple or even heightened negligence will not suffice.

Id., at 407, citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).

In this case, Kyle has alleged that Benton County, through its Sheriff and County Commission, had a policy or custom of violating the constitutional rights of persons holding opinions with which they disagree.

The evidence shows that Thornton is the Chairman of the Benton County Commission. He testified that he and the Commission, the final policymaking body for the County, had an agreed but unwritten rule that no one would be allowed to "bash" a County

---

[7] Kyle has sued all of the individual defendants in their official capacities as well as their individual capacities. However, "[o]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell, 436 U.S. at 691, *quoted in* St. John v. Hickey, 411 F.3d 762, 775 (6th cir. 2005).

official during a Commission meeting if he or she was not present at the time. The Court has determined that this rule violates the First Amendment because it is not content-neutral. Therefore, a jury could find that Kyle's constitutional rights were violated because of the enforcement of a Benton County policy or custom, and that Thornton's enforcement of the rule was done with deliberate indifference to its obvious consequences. Benton County is not entitled to judgment as a matter of law on this issue.

As the Court has concluded that Kyle's constitutional rights were not violated by the other actions of which he complains, Benton County is entitled to judgment as a matter of law on all other issues.

<u>State Law Claims</u>

Kyle's claims under Tennessee law are governed by the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-201 *et seq.* The § 1983 claims would ordinarily confer supplemental jurisdiction over the TGTLA claims because they arise out of the same facts and form part of the same case or controversy. <u>See</u> 28 U.S.C. § 1367(a). However, TGTLA claims must be brought in "strict compliance" with the terms of the statute. Tenn. Code Ann. § 29-20-201(c). The TGTLA gives the state circuit courts exclusive original jurisdiction over claims brought pursuant to its provisions. § 29-20-307.

A federal district court may, in its discretion, decline supplemental jurisdiction over a state law claim, even if jurisdiction would otherwise be proper under 28 U.S.C. § 1367(a). Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction

over a claim under subsection (a) if . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

In Gregory v. Shelby County, Tenn., 220 F.3d 433 (6th Cir. 2000), the Court of Appeals affirmed the district court's dismissal of the TGTLA claims, stating, "[i]n this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." Id. at 446. See also Maxwell v. Conn, No. 89-5060, 1990 WL 2774 (6th Cir. Jan. 18, 1990) (TGTLA's grant of exclusive jurisdiction to the state courts "belied" plaintiff's argument that he could expect to try the TGTLA claims in the same proceeding as his federal claims); Spurlock v. Whitley, 971 F. Supp. 1166, 1185 (M.D. Tenn. 1997).

Furthermore, in Beddingfield v. City of Pulaski, 666 F. Supp. 1064 (M.D. Tenn. 1987), *rev'd on other grounds*, 861 F.2d 968 (6th Cir. 1988), the court held that the TGTLA's exclusive grant of jurisdiction to the state circuit courts precluded the federal court's exercise of supplemental jurisdiction over TGTLA claims. The court reasoned that when such supplemental state law claims involve neither federal law nor federal diversity jurisdiction, no Supremacy Clause interests are implicated. Therefore, federal courts would appear obligated to apply the TGTLA limitations on suability as a matter of state substantive law. See Fromuth v. Metropolitan Gov't of Nashville, 158 F. Supp. 2d 787, 798 (M.D. Tenn. 2001).

The Court declines to accept jurisdiction over Kyle's claims brought pursuant to Tennessee law, in accordance with 28 U.S.C. § 1367(c)(4).

Conclusion

The motion for summary judgment is DENIED on plaintiff's claim that defendants Jimmy Thornton and Benton County violated his First Amendment right to make negative comments about certain commissioners at the May 17, 2004 meeting of the Benton County Commission. The motion for summary judgment is GRANTED in all other respects.

Plaintiff's state law claims are hereby DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(4).

IT IS SO ORDERED.

_James D. Todd_
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

_8 September 2005_
DATE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 29 in
case 1:04-CV-01180 was distributed by fax, mail, or direct printing on
September 12, 2005 to the parties listed.

---

John D. Schwalb
WILLIAMS & SCHWALB, PLLC
1111 Columbia Ave.
Franklin, TN 37064

Frank M. DesLauriers
DESLAURIERS LAW FIRM
P.O. Box 1156
Covington, TN 38019--115

D. Scott Porch
WILLIAMS & SCHWALB, PLLC
1111 Columbia Ave.
Franklin, TN 37064

Honorable James Todd
US DISTRICT COURT